RECEIVED
AND FILED

FEB 14 2023

**IN THE CIRCUIT COURT OF ADAMS COUNTY, MISSISSIPPI** GIVENS, CIRCUIT CLERK

BY_____ _____ D.C.

ESTATE OF HENRY MISSICK aka
ANTHONY ALEXANDER JONES by and
through Personal Representative
OWEN GOODWYNE

      Plaintiff,

v.

CORECIVIC, INC.

      Defendant.

No. 23- KV-0014-D

Jury Demanded

CERTIFIED
TRUE COPY

MAR 27 2023

EVA J. GIVENS, CIRCUIT **CLERK**
BY_____ _____ **D.C.**

## COMPLAINT

1.      On December 17, 2020, Anthony Jones, born Henry Missick, died in Immigration and Customs Enforcement ("ICE") custody at Adams County Detention Center ("ACDC") in Natchez, Mississippi. He died alone waiting to receive medical attention that never arrived.

2.      Defendant CoreCivic is a private prison corporation that operates ACDC.

3.      On the morning of December 17, 2020, CoreCivic employees prevented Mr. Jones from seeking medical attention at ACDC's medical unit for at least thirty-six minutes after he first reported pain in his chest and burning in his arm.

4.      When Mr. Jones finally reached ACDC's medical unit, CoreCivic medical staff performed an electrocardiogram ("EKG") test on him. When the test yielded abnormal results, medical staff failed to properly monitor Mr. Jones or transport him to a hospital. Instead, the staff sent him to a medical waiting room.

5.      CoreCivic nurses checked his vital signs twice in that waiting room then left him alone. Four minutes later, he fell unconscious. Forty minutes then passed before he was found, and even longer before CoreCivic employees initiated cardiopulmonary resuscitation ("CPR") and other life saving measures. By then, it was too late and Mr. Jones died.

6.      The acts and omissions of CoreCivic and its employees were the cause of Mr. Jones' death.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this case pursuant to Miss. Const. art. VI, § 156. Venue lies in this Court pursuant to Miss. Code Ann. § 11-11-3. Adams County is where the acts, omissions, and events occurred that give rise to this Complaint. The Court has specific personal jurisdiction over Defendant given that CoreCivic operates ACDC in Adams County and operates another detention facility within the State of Mississippi.

## PARTIES

8.      The Estate of Henry Missick aka Anthony Alexander Jones was established by Florida's 17th Judicial Circuit Court on April 16, 2021. Mr. Jones was born Henry Missick but used the name Anthony Jones for most of his life. This suit is brought by the estate's personal representative, Owen Goodwyne.

9.      Defendant CoreCivic owns and operates ACDC and one other prison in Mississippi. At all relevant times, CoreCivic owned and operated ACDC under contract with Adams County, Mississippi. Adams County maintains an Intergovernmental Service Agreement with ICE to detain immigrants at ACDC.

2

## FACTS

### Anthony Jones' History

10.     Mr. Jones was born Henry Missick in the Bahamas on March 26, 1969, and came to the United States when he was fourteen-years-old.

11.     At some point after he entered the United States, Mr. Missick began using the name Anthony Jones.

12.     Mr. Jones worked in the United States, often building homes and tiling.

13.     Mr. Jones was not a U.S. citizen or permanent resident.  ICE arrested him on October 2, 2019 pursuant to a removal order and detained him at ACDC.

14.     He is now survived by his three daughters, aged thirty-three, twenty-seven, and four.

### CoreCivic's History

15.     Defendant CoreCivic has long failed to provide adequate medical care and to sufficiently staff its jails and prisons it operates.[1] These failures often carry deadly results.[2]

16.     In August of 2016, the U.S. Department of Justice's Office of the Inspector General ("DOJ OIG") detailed widespread deficiencies in staffing and medical care at prisons operated by private contractors, including CoreCivic (then Corrections Corporation of America).[3]

---

[1] *See e.g. Chaverra v. United States*, No. 4:19-CV-81 (CDL), 2020 WL 5579554, at *2 (M.D. Ga. Sept. 17, 2020) (Denying CoreCivic's motion to dismiss where facility "suffered from chronic shortages of medical staff positions; only one of the four required behavioral health positions in Stewart Detention Center's staffing plan was filled, there was no on-site psychiatrist, and there was only one licensed clinical social worker responsible for treating the nearly 2,000 detainees."); *Pierce v. D.C.*, 128 F. Supp. 3d 250, 284 (D.D.C. 2015) (finding prisoner's ADA and Section 504 rights violated at CoreCivic facility).
[2] *See e.g.* ICE Office of Professional Responsibility, Detainee Death Review – Raquel Calderon De-Hidalgo. https://www.ice.gov/doclib/foia/reports/ddr-Calderon.pdf; Office of Professional Responsibility, Detainee Death Review – Igor Zyazin, https://www.ice.gov/doclib/foia/reports/ddr-Zyazin.pdf.
[3] *See* DOJ OIG, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons-16-06*, Aug. 2016, available at https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18- 67-Jun18.pdf.

17.     That same year, CoreCivic shareholders filed suit alleging corporate misrepresentations regarding "inadequate health services and understaffing in its BOP facilities." *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2017 WL 6442145, at *15 (M.D. Tenn. Dec. 18, 2017).

18.     In 2020, the Tennessee Comptroller's Office found that CoreCivic failed to properly document inmate deaths and to adequately staff its facilities in the state.[4] In particular, the Comptroller found that "CoreCivic-managed facilities have experienced significant difficulties in hiring and retaining a sufficient number of correctional officers," and that "[l]ow staffing levels coupled with frequent overtime impacts management's ability to provide safe and secure facilities, especially in emergencies."

19.     A chart compiled as part of the audit revealed CoreCivic facilities in Tennessee logged more than double the number of "life-threatening matters and breaches of security" compared to non CoreCivic facilities.[5]

20.     Despite multiple warnings regarding the violations of basic standards of medical medical care and staffing, CoreCivic facilities continue to be plagued by the same problems.[6]

**ACDC's History**

21.     Defendant Corecivic opened ACDC in July of 2009. At the time, CoreCivic, which was then known as the Corrections Corporation of America, contracted with the United States Bureau of Prisons to use ACDC as a federal prison.

---

[4] *See* Tennessee Comptroller of the Treasury, *Performance Audit Report-Department of Correction*, Jan. 2020, available at https://comptroller.tn.gov/content/dam/cot/sa/advanced-search/2020/pa19032.pdf.
[5] *Id*. at 62.
[6] DHS OIG, *OIG-21-61: Violations of ICE Detention Standards at Torrance County Detention Facility*, Sep. 28, 2022, available at
https://www.oig.dhs.gov/sites/default/files/assets/2022-09/OIG-22-75-Sep22.pdf;  DHS OIG, *OIG-21-61: Violations of ICE Detention Standards at Otay Mesa Detention Center*, Sep. 21, 2021, available at https://www.oig.dhs.gov/sites/default/files/assets/2021-09/OIG-21-61-Sep21.pdf.

22.     In 2012, a riot at ACDC left one correctional officer dead and twenty other people injured. A DOJ investigation determined that the "cause of the riot was what the inmates perceived to be inadequate food, medical conditions and disrespectful staff members."[7] Those imprisoned at ACDC at the time described how facility staff continuously ignored conditions that were "increasingly dangerous and intolerable, including medical neglect, excessive use of segregation, spoiled food, a lack of interpreters, and mistreatment by staff."[8]

23.     In May of 2019, the DOJ opted against renewing its contract with ACDC.[9] Four months later, CoreCivic announced that it contracted with ICE to detain immigrants at ACDC. At the time ICE Field Office staff recommended against entering into the contract "because of that facility's history of chronic understaffing in correctional and health services."[10]

24.     Since 2019, allegations of poor medical treatment and other abuses at ACDC have persisted.[11]

---

[7] DOJ, *Two Inmates Sentenced in Adams County Prison Riot Case*, Jul. 13, 2016, available at https://www.justice.gov/usao-sdms/pr/two-inmates-sentenced-adams-county-prison-riot-case.
[8] Janosch Delcker, *FATAL CORRECTIONS Inside the Deadly Mississippi Riot That Pushed the Justice Department to Rein In Private Prisons,* The Intercept, Dec. 17, 2016, available at https://theintercept.com/2016/12/17/inside-the-deadly-mississippi-riot-that-pushed-the-justice-department-to-rein-in-private-prisons/.
[9] The Natchez Democrat, *CoreCivic: Federal Bureau of Prisons will not renew contract with Adams County Correctional Center*, May 2, 2019, https://www.natchezdemocrat.com/2019/05/02/core-civic-federal-bureau-of-prison-will-not-renew-contract-with-adams-county-correctional-center/.
[10] Corecivic, *CoreCivic Enters Into New Management Contract at the Adams County Correctional Center*, Sep. 3, 2019, https://ir.corecivic.com/news-releases/news-release-details/corecivic-enters-new-management-contract-adams-county; U.S. Gov't and Accountability Office, *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* at 22, Jan. 13, 2021, https://www.gao.gov/products/GAO-21-149.
[11] *See e.g. Letter Secretary Mayorkas and Acting Director Johnson*, Member of Congress Jason Crow *et. al*, May 11, 2021, https://crow.house.gov/sites/crow.house.gov/files/05.11.21%20-%20Letter%20to%20Secretary%20Mayorkas%20and%20Acting%20Director%20Johnson%20Regarding%20GAO%20Report%20on%20ICE%20Detention%20Contracts.pdf; *ICE use of torture to coerce immigrants into signing immigration documents at Adams County Correctional Facility*, Freedom for Immigrants, Oct. 8, 2020, https://www.freedomforimmigrants.org/crei/2020/10/8/re-immigration-and-customs-enforcement-officers-use-of-torture-to-coerce-immigrants-into-signing-immigration-documents-at-adams-county-correctional-facility; Gaby del Valle and Jack Herrera, *'Like Petri Dishes for the Virus': ICE Detention Centers*

5

### Mr. Jones' Death at ACDC

25.     On October 15, 2019, ACDC Nurse Practitioner ("NP")[12] Stacy Cook performed an initial screening of Mr. Jones. The screening revealed that Mr. Jones suffered from high blood pressure.

26.     On October 28, 2019, NP Cook took an EKG of his heart.

27.     On November 12, 2019, Dr. Collins reviewed the EKG results, which displayed a sinus rhythm with possible left ventricular hypertrophy.

28.     Dr. Collins chose to place Mr. Jones on weekly blood pressure monitoring. She did not refer Mr. Jones to a cardiologist or take any other signification action. CoreCivic medical staff failed to perform their weekly checks on Mr. Jones on one or more occasions in November of 2019 and January and May of 2020.

29.     Mr. Jones began experiencing frequent nosebleeds and sinus pain during his time in detention.

30.     On December 17, 2020, the date of his death, Mr. Jones first complained of chest pains to another detained person in his unit at around 3:45 a.m. His first opportunity to report his symptoms occurred at 7:00 a.m. when guards Winey and Williams came to his cell to count him for ACDC's scheduled facility-wide count of detained persons.

31.     He told the guards that he was experiencing chest pains and that his arm was hurting. They told him that he needed to wait until the facility count finished before he could go to the medical unit.

_____

*Threaten the Rural South*, Politico, May 5, 2020, https://www.politico.com/news/magazine/2020/05/05/coronavirus-ice-detention-rural-communities-18668 8.
[12] CoreCivic employed all ACDC medical staff and guards referenced in this complaint during all times relevant to the complaint.

32.     At 7:24 a.m.. Mr. Jones approached the guard station in his unit and again reported his chest pain. However, he again was told, by guard Murphy and Lieutenant Lowe, that he needed to wait until the count finished.

33.     When guard Murphy then asked guard Barnes in ACDC's central control unit for instructions, Ms. Barnes responded that Mr. Jones would have to wait until the count finished. CoreCivic policy and practice does not allow movement of a detained person during a facility count.

34.     As Mr. Jones waited, he sank his head between his legs and continuously grabbed and rubbed his arm and legs. Despite these obvious signs of distress, the guards did not allow Mr. Jones to leave the unit until 7:36 a.m., when the count had finished and guard Detrick Windling escorted Mr. Jones to the medical unit.

35.     Mr. Jones arrived at the ACDC medical unit at 7:39 a.m. There, he reported to RN Brown, the charge nurse on duty, and ACDC Lieutenant Moore that he had felt burning in his chest and arms for the past three hours.

36.     At 7:54 a.m., RN Brown completed an EKG of Mr. Jones, which showed various abnormalities such as mild sinus bradycardia (52 bpm), moderate ST depression in V3, V4" and T wave inversions. ACDC's medical computer system alerted Dr. Collins of these abnormalities. At that point, Dr. Collins and Nurse Brown should have immediately called 911 and transported Mr. Jones to a hospital, the closest of which was only a twenty minute drive away.

37.     Rather than call for Mr. Jones to be transported to the hospital, Dr. Collins at 8:01 a.m. ordered that Mr. Jones be placed on 2 liters of oxygen, administration of aspirin, nitroglycerin sublingual tablets, and Mylanta and further ordered that CoreCivic medical staff monitor Mr. Jones for one hour. Dr. Collins did not order that Mr. Jones be kept on an EKG or

other heart monitor. She also decided that Mr. Jones should be taken out of the medical unit and placed into a peripheral medical waiting room.

38.     At 8:06 a.m., ACDC Licensed Nurse Practitioner ("LPN") Kenishia Coffie escorted Mr. Jones out of the medical unit, where he would have been easily observable by medical staff, to the waiting room.

39.     While medical staff are required by CoreCivic policy to remain within "sight and sound" of all patients, there is no such requirement for the medical waiting room. Nonetheless, the medical waiting room is observable both through ACDC's closed circuit television and through a large window between the medical unit and the waiting room. However, while Mr. Jones was in the waiting room, neither the medical staff nor any guards monitored him on an ongoing basis through direct observation or closed circuit television. Between 8:18 a.m. and 8:26 a.m., LPN Coffie and RN Tenner each took Mr. Jones' vital signs once. Mr. Jones reported to LPN Coffie that he still felt burning in his right arm. The nurses exited the waiting room immediately after taking Mr. Jones' vital signs to attend to other duties.

40.     Four nurses, along with a CoreCivic officer who briefly entered the waiting room, observed Mr. Jones touching his arms, rubbing his legs, and rocking back and forth uncomfortably. However, none reported the symptoms to Dr. Collins or called 911.

41.     After 8:26 a.m., all CoreCivic staff left Mr. Jones alone in the waiting room and no CoreCivic employee maintained any visual observation of him. Mr. Jones continued touching his arms, rubbing his legs, and rocking back and forth.

42.     At 8:30 a.m., Mr. Jones began moving his arms and then slumped over to his right. His legs then began moving and his body started jerking. Mr. Jones then urinated on himself and fell motionless across the chairs in the waiting room.

43.     Mr. Jones laid there alone, motionless, and covered in his own urine for the next **forty minutes.** A CoreCivic guard discovered him at 9:10 a.m.

44.     The guard tapped him on the shoulder, and when Mr. Jones did not respond, she exited the waiting room.

45.     It was four minutes later, at 9:14 a.m., before Dr. Collins and RN Brown entered the waiting room and checked Mr. Jones for a pulse. They failed to immediately perform CPR or other life saving measures on Mr. Jones.

46.     Not until 9:22 a.m. did CoreCivic medical staff begin CPR on Mr. Jones. They did not apply automated external defibrillation ("AED") until 9:24 a.m. or administer ephedrine until 9:27 a.m.

47.     CoreCivic medical staff's efforts to revive Mr. Jones continued until 9:56 a.m., when a paramedic arrived. The paramedic pronounced Mr. Jones dead three minutes later of heart failure.

48.     A state medical examiner performed an autopsy on Mr. Jones' body on December 21, 2020 and listed the cause of death as Artherosclorotic Cardiovascular Disease.

49.     Had treatment been administered earlier that morning, Mr. Jones' life could have been saved.  He should have been sent to the medical unit sooner.  An ambulance should have been called immediately after the problematic EKG reading so Mr. Jones could be transported to the hospital.  He he been in an ambulance or the hospital instead of ACDC when he lost consciousness, medical staff would have been able to immediately begin administering life saving measures such as CPR, AED, and ephedrine.

9

50.     Initiating CPR, AED, and ephedrine quickly is the standard medical intervention when an individual has a heart attack or other serious cardiac complications and dramatically increases chances of survival.

51.     Had Mr. Jones been in a hospital, a proper cardiology evaluation would have discovered the blockages in his arteries. In addition to administering emergency measures when he passed out, hospital staff could and would have taken other measures to clear the blockages and save his life.

52.     Even though an ambulance was not called immediately after the EKG reading, CoreCivic's medical staff could have prevented his death if they had provided the constant monitoring that his condition required and administered emergency measures immediately after he passed out. Those emergency measures would have allowed him to continue to live while they called an ambulance and had him transported to the hospital, where he could receive the necessary treatment.

53.     Because Mr. Jones was not in a hospital or an ambulance or in the medical unit at ACDC when he lost consciousness that morning, and because he instead was unmonitored by CoreCivic staff in the medical waiting room, nearly an hour passed before life-saving treatment was administered.  By then it was too late.

**Standards and Directives**

54.     At all times relevant to this complaint, CoreCivic was required to follow ICE's 2011 Performance Based National Detention Standards ("PBNDS"), ICE's ACDC Quality Assurance Surveillance Plan ("QASP"), the American Correctional Association's Performance Based Standards for Adult Local Detention Facilities ("ACA Standards"), and the National Commission on Correctional Health Care's Standards for Health Services in Jails ("NCCHC

Standards") at ACDC pursuant to an intergovernmental service agreement and other contracts between ICE, Adams County, and CoreCivic.

55.     The 2011 PBNDS mandates that each facility's administrator "shall ensure that the facility conducts appropriate orientation, initial training and annual training for all staff, contractors and volunteers" and implement "appropriate assessment measures."[13]

56.     Under the PBNDS' health care section, each facility contractor is responsible for providing detained persons "specialty health care," "emergency care," and "hospitalization as needed within the local community."[14]

57.     Under the ACA Standards, detained persons who require health care beyond the resources available in a facility must be referred and transferred to a facility where such care is available. Treatment of a detained person's condition should not be limited by the resources and services available within a given facility.

58.     Likewise, per the NCCHC standards, a facility operator must provide appropriate and timely access to specialty care and hospital services to patients who need these services. Clinical need must dictate when the patient receives those services.

59.     In areas "where detainees are admitted for health observation and care under the supervision and direction of health care personnel," the 2011 PBNDS requires that staff members remain "within sight or sound of all patients."[15]

60.     Similarly, under the ACA Standards, detention facilities that maintain an onsite medical unit must ensure that patients are within sight or sound of a staff member.

---

[13] *See* ICE, 2011 PBNDS 7.3: Staff Training, revised Dec. 2016, available at:
https://www.ice.gov/doclib/detention-standards/2011/7-3.pdf.
[14] *See* ICE, 2011 PBNDS 4.3: Medical Care, revised Dec. 2016, available at:
https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf.
[15] *Id.*

61.     Per the NCCHC Standards. space in a facility's medical unit "may also be used to provide observation beds" in which detained people may be watched and supervised by staff.

62.     The 2011 PBNDS requires that a facility's health services administrator ensure "that medical staff have training and competency in implementing the facility's emergency health care plan appropriate for each staff's scope of practice or position." A facility's administrator must ensure "that non-medical staff have appropriate training and competency in implementing the facility's emergency plan appropriate for each staff's position."[16]

63.     Under the QASP, "all new Officers and Custody staff will receive 120 hours of training as delineated in the ACA Standards during the first year of employment." The contractor must then "conduct 40 hours of Refresher Training for all Officers and Custody staff" yearly.

64.     Pursuant to the QASP, security staff "shall be trained annually in basic first aid and CPR" and must be able to respond to emergency situations within four minutes, recognize warning signs of impending medical emergencies, and know how to obtain medical assistance.

65.     Contractors must also "provide medical staff and sufficient support personnel to meet these [medical] standards." Staffing plans must be "reviewed at least annually."

66.     Specifically as to emergency care, the PBNDS requires that staff be trained on "cardio pulmonary resuscitation (CPR, AED), and emergency first aid training annually," on how to respond to "health-related situations within four minutes," and on the appropriate "plan and procedures for providing emergency medical care including, when required. the safe and secure transfer of detainees for appropriate hospital or other medical services."[17]

67.     When a facility's "non-medical employee is unsure whether emergency care is required, he/she shall immediately notify medical personnel to make the determination."[18]

_____

[16] *Id.*
[17] *Id.*
[18] *Id.*

12

68.     The 2011 PBNDS requires that contractors allow detained persons access to emergency medical care during a population count. If, "while conducting a count, staff observe an unusual incident (e.g., medical emergency, criminal act), they shall cease the count and respond appropriately according to local procedures."[19]

69.     Mississippi healthcare regulations also governed medical care at ACDC.

70.     The Minimum Standards of Operation for Mississippi Hospitals Facilities ("Minimum Standards"), defines a hospital as "a place devoted primarily to the maintenance and operation of facilities for the diagnosis, treatment and care of individuals suffering from physical or mental infirmity, illness, disease, injury or deformity, or a place devoted primarily to providing obstetrical or other medical, surgical, or nursing care of individuals." 15 Miss. Code R. § 16-1-41.2.1 ACDC's medical unit is a hospital.

71.     Under the Minimum Standards, "[facilities] shall be provided to assure prompt diagnosis and emergency treatment." 15 Miss. Code R. § 16-1-41.27.1.

72.     Facilities must have "adequate medical and nursing personnel available at all times," and "medical staff shall be responsible for insuring adequate medical coverage for emergency services." 15 Miss. Code R. § 16-1-41.28.1-2.

73.     The facility must "maintain an organized nursing staff to provide high quality nursing care for the needs of the patients and to be responsible to the hospital for the professional performance of its members." 15 Miss. Code R. § 16-1-41.30.1. It must also ensure "sufficient number of duly licensed registered nurses on duty at all times to plan, assign, supervise, and evaluate nursing care, as well as to give patients the nursing care that requires judgment and specialized skills of a registered nurse." Id.

---

[19] See ICE, 2011 PBNDS 2.8: Population Counts, revised Dec. 2016, available at https://www.ice.gov/doclib/detention-standards/2011/2-8.pdf.

74.     Policy 3.12 of the Mississippi State Board of Medical Licensure allows "a physician to work in consultation with or employ allied health professionals, as long as they are appropriately trained to perform the activities being requested."[20] However, the "physician is the one ultimately responsible for all care given" and must "never delegate a task beyond the education and training of the medical assistant." A physician also should provide "[d]irect and proper supervision. . . at all times."

75.     Pursuant to the Mississippi Board Of Nursing Rules And Regulations, a RN "shall be held accountable for the quality of nursing care given to patients." 15 Miss. Code R. § 30-2830-1.2. This responsibility includes "[m]aking decisions that are based upon knowledge, competency, experience and the use of the nursing process." and "[p]racticing within the scope of practice as established by the board and according to generally accepted standards of practice." 15 Miss. Code R. 30-2830-1.1.

76.     RNs are also responsible and accountable for "[o]rganizing, administering and supervising the implementation and evaluation of a written nursing care plan for each patient for whom responsibility has been accepted" and "communicating patient response to nursing interventions to other members of the health team." 15 Miss. Code R. § 30-2830-1.2(G), 1.4.

77.     A LPN's responsibilities include "[p]roviding for the emotional and physical comfort of patients. . . [o]bserving, recording and reporting to the appropriate person the signs and symptoms which may be indicative of change in the patient's condition" and appraising a "patient's status and situation at hand that contributes to ongoing data collection and the comprehensive assessment by the RN." 15 Miss. Code R. § 30-2830-2.3(B)-(D).

---

[20] Mississippi State Board of Medical Licensure, Policies, Sep. 2021, available at: https://www.msbml.ms.gov/sites/default/files/Rules_Laws_Policies/9-2021Policies.pdf

**DHS OIG Report**

78.     On July 14, 2021, the Department of Homeland Security's Office of Inspector General ("DHS OIG") released a report regarding detention conditions at ACDC.[21]

79.     The report concluded that after CoreCivic medical staff administered its December 17, 2020 EKG on Mr. Jones, they should have promptly called 911 and sent Mr. Jones to the hospital where life support care would have been readily available.

## NOTICE

80.     A notice of intent to sue consistent with Miss. Code Ann. 15-1-36(15) was served on the Defendant on December 16, 2022.

## CLAIM FOR RELIEF

81.     Plaintiff realleges and incorporates by reference all allegations in the foregoing paragraphs.

82.     The Defendant is liable for the actions and omissions of all of its agents and employees, including those who are referenced in this Complaint.

83.     At all relevant times, the Defendant and its employees had a duty to exercise ordinary and reasonable care for Mr. Jones. The medical staff had a duty to provide competent treatment with acceptable levels of care, skill, and diligence, and to provide quality medical care and treatment consistent with national and state standards.

84.     The actions and omissions of the Defendant and its employees with respect to Mr. Jones were a breach of these duties and fell below these standards. These actions and omissions were negligent, grossly negligent, reckless, willful, intentional, and malicious. They also constitute negligence per se. They were the proximate cause of Mr. Jones' suffering and death.

---

[21] DHS OIG, *Violations of ICE Detention Standards at Adams County Correctional Center*, Jul. 14, 2021, https://www.oig.dhs.gov/sites/default/files/assets/2021-07/OIG-21-46-Jul21.pdf.

Had the Defendant and its employees fulfilled their duties and performed according to the required standard of care, Mr. Jones would not have died.

85.     These acts and omissions include, but were not limited to, the failure by the guards and others to deliver Mr. Jones to the medical unit sooner, the failure of the medical staff to refer Mr. Jones for treatment by a specialist, the failure of the medical staff to call 911 on December 17, 2020 and send Mr. Jones to the hospital so that he could be treated promptly, the failure of medical staff and guards to consistently monitor the condition of Mr. Jones on December 17, 2020 so that emergency treatment could be promptly administered when needed, the failure to promptly administer emergency treatment, and any understaffing that contributed to these acts and omissions.

## DAMAGES

86.     As a direct and proximate cause of the Defendant's actions and omissions, Mr. Jones died on December 17, 2020.  He and his survivors endured and incurred damages, including but not limited to severe and foreseeable physical and emotional pain and suffering, loss of enjoyment of life, funeral expenses, and all other damages available for his wrongful death.  Consistent with Miss. Code Ann. 11-1-59, the amount of damages is not specified but it exceeds $10,000.00 and is within the jurisdictional limits of this Court.

87.     The acts and omissions of the Defendant were intentional, wanton, malicious and/or exhibited a deliberate,conscious, and/or reckless disregard for Mr. Jones' safety, his rights, and his life, and should be punished with an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court empanel a jury and upon the conclusion of the trial:

a.  Enter judgment in favor of Plaintiff and against the Defendant:

b.  Award Plaintiff compensatory damages against all Defendants and punitive damages
    against Defendant in amounts to be determined by the jury at trial;

c.  Award Plaintiff reasonable attorneys' fees and costs; and

d.  Award Plaintiff such further relief as the Court deems just, equitable, and appropriate

Dated: February 14, 2023

Respectfully submitted,

Robert B. McDuff
Miss. Bar No. 2532
767 North Congress Street
Jackson MS 39202
601-259-8484
rbm@mcdufflaw.com

*Counsel for Plaintiff*

## <u>CERTIFICATION</u>

I hereby certify that I have reviewed the facts of this case and obtained a consultation with a medical expert qualified to provide expert testimony as to the standard of care and negligence and who I reasonably believe is knowledgeable in the issue relevant to this particular case, and on the basis of such review and consultation believe that there is a reasonable basis for the commencement of this action.

This 13th day of February, 2023.

                                      Robert B. McDuff

## IN THE CIRCUIT COURT OF ADAMS COUNTY, MISSISSIPPI

Estate of Henry Missick aka Anthony
Alexander Jones by and through
Personal Representative Owen
Goodwyne,
**Plaintiff**
v.
CoreCivic, Inc.,
Defendant.

Civil Action No. __23-KV-0014-D__

**SUMMONS**

CERTIFIED
TRUE COPY

THE STATE OF MISSISSIPPI
COUNTY OF ADAMS

MAR 27 2023

TO: CoreCivic, Inc.
    c/o Registered Agent C T Corporation System
    645 Lakeland East Drive, #101 Flowood, MS 39232

EVA J. GIVENS, CIRCUIT CLERK
BY_____D.C.

### NOTICE TO DEFENDANT(S)

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND
YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

You are required to mail or hand deliver a copy of a written response to the Complaint to
__Robert B. McDuff__, the attorney for the Plaintiff(s), whose mailing address is __767 N. Congress Street, Jackson, MS, 39202__ and whose street address is 767 N. Congress Street, Jackson, MS, 39202.

Your response must be mailed or delivered within (30) days from the date of delivery of
this summons and complaint or a judgment by default will be entered against you for the money
or other things demanded in the complaint.

You must also file the original of your response with the Clerk of this Court within
a reasonable time afterward.

Issued under my hand and the seal of said Court, this 14 day of February, 2023.

_____
Clerk of Adams County,
Mississippi

(Seal)

## PROOF OF SERVICE—SUMMONS
(Process Server)

**NAME OF PERSON OR ENTITY SERVED:** _____

I, the undersigned process server, served the Summons and Complaint upon the person or entity named above in the manner set forth below (process server must check proper space and provide all additional information that is requested and pertinent to the mode of service used):

[ ]     **FIRST CLASS MAIL AND ACKNOWLEDGEMENT SERVICE.** By mailing (by first class mail, postage prepaid), on the date stated in the attached Notice, copies to the person served, together with copies of the form of notice and acknowledgement and return envelope, postage prepaid, addressed to the sender (Attach completed acknowledgment of receipt pursuant to M.R.C.P. Form 1B).

[     ]     **PERSONAL     SERVICE:**     I     personally     delivered     copies     to _____ on the _____ day of _____, 20___, where I found him/her     in     _____     County,     State     of _____.

[ ]     **RESIDENCE SERVICE:** After exercising reasonable diligence I was unable to deliver copies  to  said  person  within  _____  County,  State  of _____.  I served the Summons and Complaint on the ___ day of _____, 20____, at the usual place of abode of the said person by leaving a true copy with _____, who is the _____ (wife, husband, son, daughter or other person as the case may be) of said individual and a member of his/her family over the age of sixteen (16) years who was willing to receive the same on his/her behalf.  I mailed, by first class mail, postage prepaid, copies to the person at his/her usual place of abode where the copies were left.

[ ]     **CERTIFIED MAIL SERVICE:** By mailing to an address outside Mississippi (by first class mail, postage prepaid, requiring a return receipt) copies to the person served.  (Attach signed return receipt or the return envelope marked "Refused.")

At the time of service, I was at least eighteen (18) years of age and not a party to this action.

Fee for service:  $_____

Process server must list below:  [Please print or type]

Name: _____

Address: _____

_____

Telephone No._____

STATE OF _____
COUNTY OF _____


       Personally appeared before me the undersigned authority in and for the state and county aforesaid, the within named _____, who being first by me duly sworn states on oath that the matters and facts set forth in the foregoing "Proof of Service—Summons" are true and correct as therein stated.

_____
Process Server's Signature


      Sworn to and subscribed before me this the _____ day of _____ 20_____.


_____
Notary Public

(Seal) My Commission Expires:

## IN THE CIRCUIT COURT OF ADAMS COUNTY, MISSISSIPPI

Estate of Henry Missick aka Anthony
Alexander Jones by and through
Personal Representative Owen
Goodwyne,
**Plaintiff**
v.                                          Civil Action No. 23- KV-0014- D
CoreCivic, Inc.,
**Defendant.**

**SUMMONS**

CERTIFIED
TRUE COPY

MAR 27 2023

EVA J. GIVENS, CIRCUIT CLERK
BY_____D.C.

THE STATE OF MISSISSIPPI
COUNTY OF ADAMS

TO: CoreCivic, Inc.
      c/o Registered Agent C T Corporation System
      300 Montvue Rd Knoxville, TN 37919-5546

### NOTICE TO DEFENDANT(S)

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND
YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

     You are required to mail or hand deliver a copy of a written response to the Complaint to
 Robert B. McDuff_____, the attorney for the Plaintiff(s), whose mailing address is    767
N. Congress Street, Jackson, MS, 39202  and whose street address is 767 N. Congress Street,
Jackson, MS, 39202.

     Your response must be mailed or delivered within (30) days from the date of delivery of
this summons and complaint or a judgment by default will be entered against you for the money
or other things demanded in the complaint.

     You must also file the original of your response with the Clerk of this Court within
a reasonable time afterward.

     Issued under my hand and the seal of said Court, this 14 day of February, 2023.

_____

Clerk of Adams County,
Mississippi



(Seal)

## PROOF OF SERVICE—SUMMONS
(Process Server)

**NAME OF PERSON OR ENTITY SERVED:** _____

I, the undersigned process server, served the Summons and Complaint upon the person or entity named above in the manner set forth below (process server must check proper space and provide all additional information that is requested and pertinent to the mode of service used):

[ ]     **FIRST CLASS MAIL AND ACKNOWLEDGEMENT SERVICE.**  By mailing (by first class mail, postage prepaid), on the date stated in the attached Notice, copies to the person served, together with copies of the form of notice and acknowledgement and return envelope, postage prepaid, addressed to the sender (Attach completed acknowledgment of receipt pursuant to M.R.C.P. Form 1B).

[ ]     **PERSONAL         SERVICE:**         I      personally      delivered      copies      to _____ on the _____ day of _____, 20____, where I found him/her      in      _____      County,      State      of _____.

[ ]     **RESIDENCE SERVICE:** After exercising reasonable diligence I was unable to deliver copies   to   said   person   within   _____   County,   State   of _____.  I served the Summons and Complaint on the ____ day of _____, 20____, at the usual place of abode of the said person by leaving a true copy with _____, who is the _____ (wife, husband, son, daughter or other person as the case may be) of said individual and a member of his/her family over the age of sixteen (16) years who was willing to receive the same on his/her behalf.  I mailed, by first class mail, postage prepaid, copies to the person at his/her usual place of abode where the copies were left.

[ ]     **CERTIFIED MAIL SERVICE**:  By mailing to an address outside Mississippi (by first class mail, postage prepaid, requiring a return receipt) copies to the person served.  (Attach signed return receipt or the return envelope marked "Refused.")

        At the time of service, I was at least eighteen (18) years of age and not a party to this action.

Fee for service: $_____

Process server must list below:  [Please print or type]

Name: _____

Address: _____

_____

Telephone No. _____

STATE OF _____
COUNTY OF _____

     Personally appeared before me the undersigned authority in and for the state and county aforesaid, the within named _____, who being first by me duly sworn states on oath that the matters and facts set forth in the foregoing "Proof of Service—Summons" are true and correct as therein stated.

_____
Process Server's Signature

     Sworn to and subscribed before me this the _____ day of _____ 20____.

_____
Notary Public

(Seal) My Commission Expires:

RECEIVED
AND FILED

MAR 23 2023

**IN THE CIRCUIT COURT OF ADAMS COUNTY, MISSISSIPPI**

EVA J. GIVENS, CIRCUIT CLERK

BY_____ D.C.

ESTATE OF HENRY MISSICK aka
ANTHONY ALEXANDER JONES by and
through Personal Representative
OWEN GOODWYNE

PLAINTIFF

v.

Civil Action No. 23-KV-0014-D

CORECIVIC, INC.

DEFENDANT

**NOTICE OF FILING NOTICE OF REMOVAL**

TO:   Hon. Eva Givens
      314 State Street
      Natchez, MS 39120
      *Adams County Circuit Clerk*

CERTIFIED
TRUE COPY

MAR 27 2023

EVA J. GIVENS, CIRCUIT CLERK

BY_____ D.C.

      Robert B. McDuff
      Miss. Bar No. 2532
      767 North Congress Street
      Jackson, MS 39202
      *Counsel for Plaintiff*

Notice is hereby given pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, that Defendant

CoreCivic, Inc. filed in the United States District Court for the Southern District of Mississippi,

Western Division, a Notice of Removal, removing this cause from the Circuit Court of Adams

County, Mississippi to the United States District Court for the Southern District of Mississippi,

Western Division. A copy of the Notice of Removal is attached hereto as Exhibit "1".

This the 22nd day of March, 2023.

Respectfully Submitted,

Defendant CoreCivic, Inc.

By: _____

LEM E. MONTGOMERY, III (MB No. 100686)
ANNA LITTLE MORRIS (MB No. 105299)
Attorneys for CoreCivic, Inc.

Of Counsel:
Butler Snow, LLP
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158
Tel: 601-948-5711
Fax: 601-985-4500
Lem.montgomery@butlersnow.com
Anna.morris@butlersnow.com

## CERTIFICATE OF SERVICE

I, Anna Little Morris, one of the attorneys for the Defendant, electronically filed the

foregoing Notice of Removal with the Clerk of the Court using the Court's ECF system, which

sent notification of such filing to the following counsel of record:

Robert B. McDuff
Miss. Bar No. 2532
757 North Congress Street
Jackson, MS 39202
601-259-8484
rbm@mcdufflaw.com
Counsel for Plaintiff

SO CERTIFIED, this the 22nd day of March, 2023.

_Anna Little Morris_
ANNA LITTLE MORRIS

68164218.v1

<div style="border:1px solid black; float:right;">

**EXHIBIT**

**1**

</div>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

ESTATE OF HENRY MISSICK aka
ANTHONY ALEXANDER JONES by and                    PLAINTIFF
through Personal Representative
OWEN GOODWYNE

v.                                                Civil Action No. _____

CORECIVIC, INC.                                   DEFENDANT

TO:   THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
      DISTRICT OF MISSISSIPPI, WESTERN DIVISION
      Thad Cochran United States Courthouse
      501 E. Court Street
      Suite 2.500
      Jackson, MS 39201[1]

      Robert B. McDuff
      Miss. Bar No. 2532
      767 North Congress Street
      Jackson, MS 39202
      *Counsel for Plaintiff*

## **NOTICE OF REMOVAL**

Defendant CoreCivic, Inc. ("Defendant" or "CoreCivic"), by and through its undersigned

counsel, pursuant to U.S.C. §§ 1332, 1441, and 1446 hereby notifies this Court that it is removing

the above-captioned action currently pending in the Circuit Court of Adams County, Mississippi

to the United States District Court for the Southern District of Mississippi, Western Division. In

support of this Motion, Defendant states as follows:

---

[1] Per the Court's website, all Western Division filings should be mailed or delivered to the Clerk's Office
in Jackson. *See* U.S. DISTRICT COURT, S.D. MISS., "Court Locations," *available at*
https://www.mssd.uscourts.gov/content/natchez (last accessed March 22, 2023).

## Introduction

1.      On or about February 14, 2023, Owen Goodwyne, as personal representative for the Estate of Henry Missick, aka Anthony Alexander Jones ("Plaintiff") filed his Complaint ("Compl.") against Defendant in the Circuit Court of Adams County, Mississippi, Case No: 23-KV-0014-D.

2.      The Defendant was served with a copy of the Summons and Complaint on March 1, 2023.

3.      This Notice of Removal is timely filed less than thirty (30) days after Defendant received service of process, pursuant to 28 U.S.C. § 1446(b)(2)(B).

4.      The United States District Court for the Southern District of Mississippi, Western Division, is the federal judicial district encompassing Adams County, Mississippi. 28 U.S.C. § 104(b)(4) (stating that the Western Division of the Southern District includes Adams County). Therefore, venue lies in this Court pursuant to 28 U.S.C. § 1441(a).

5.      Plaintiff's complaint alleges that Anthony Alexander Jones ("Mr. Jones") died because of a lack of medical attention by CoreCivic personnel while in the waiting room at the Adams County Correctional Center ("ACCC") medical unit on December 17, 2020. *See* Compl. ¶¶ 3, 42.

6.      On or about December 21, 2020, a state medical examiner declared Mr. Jones's cause of death as Artherosclorotic Cardiovascular Disease. *See* Compl. ¶ 48.

7.      Plaintiff brings this wrongful death lawsuit against Defendant, asserting the following theories:

    a.   Negligence / Medical Negligence (Compl. at ¶¶ 82-85);

    b.   Negligence Per Se (Compl. at ¶ 84);

c. Punitive Damages as a result of the Defendant's acts that were allegedly "intentional, wanton, malicious and/or exhibiting a deliberate, conscious, and/or reckless disregard for [decedent's] safety, his rights, and his life." (Compl. at ¶ 87).

### There is Diversity of Citizenship Jurisdiction.

8. The basis for this removal to federal court is diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332, because: (1) there is complete diversity of citizenship between Plaintiff and Defendant, and (2) the Complaint is facially apparent that the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000.00).

### Diversity of Citizenship Requirement

*Plaintiff's Citizenship*

9. This claim is brought by Owen Goodwyne, the personal representative of the Estate of Henry Missick aka Anthony Alexander Jones ("Mr. Jones" or decedent). For purposes of diversity of citizenship, the legal representative of the estate of a decedent "shall be deemed to be a citizen only of the same State as the decedent." 28 U.S.C. § 1332(c)(2).

10. The decedent Mr. Jones was born in the Bahamas. *See* Compl. at ¶ 10. He entered the United States at or about age fourteen (14) and began work in the United States; however, he was not a U.S. Citizen or a permanent resident. *Id.* at ¶¶ 12-13.

11. The removal statute provides that diversity of citizenship exists in suits "between **citizens of a state and citizens of a foreign state,** except that the district courts shall not have original jurisdiction … of an action between citizens of a State and citizens or subjects of a foreign state who are **lawfully admitted for permanent residence in the United States and** are **domiciled in the same State."** 28 U.S.C. § 1332(a)(2) (emphasis added).

3

12.     At the time of the events alleged in the Complaint, Mr. Jones was in custody of U.S. Immigration and Customs Enforcement ("ICE") and was housed at the Adams County Correctional Center ("ACCC") in Natchez, Mississippi. *See* Compl. at ¶ 1. His domicile is not alleged in the Complaint. *See Nagalingam v. Wilson, Sowards, Bowling & Costanzo*, 8 Fed. App'x 486, 487-88 (6th Cir. 2001) (defining "domicile" as "the last place where [a detainee] resided with the intention of remaining there indefinitely"; holding that a detainee's domicile does not change due to involuntary detention elsewhere) (citing *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989)). However, as stated above, the Complaint admits that Mr. Jones was <u>not</u> admitted for permanent residence in the United States. *See* Compl. at ¶ 13.

13.     Therefore, Plaintiff is a citizen of the Bahamas (a foreign state) for purposes of diversity of citizenship jurisdiction.

<div align="center">

*Defendant's Citizenship*

</div>

14.     Defendant is a corporation formed in the state of Maryland, with its principal place of business in Tennessee. For purposes of diversity of citizenship jurisdiction, Defendant is a citizen of Maryland and Tennessee. Defendant is not a citizen of Mississippi.

<div align="center">

**Amount in Controversy Requirement**

</div>

15.     The Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy is greater than $75,000, exclusive of interest and costs. If it is facially apparent from the state court petition that the amount in controversy likely exceeds the removal threshold, then the defendant need only point this out to successfully meet its burden. *See Gebbia v. Wal-Mart Stores, Inc.*, 233 F.3d 880, 883 (5th Cir. 2000).

<div align="center">

4

</div>

16.     Although the Complaint does not specify the exact dollar amount of damages sought, it is facially apparent that the amount in controversy in this action exceeds the sum and value of $75,000, exclusive of interest and costs. *See generally* Compl.

17.     In this wrongful death lawsuit, Plaintiff seeks recovery under negligence/medical negligence and negligence per se theories, alleging that CoreCivic medical and other personnel were the actual and proximate cause of Mr. Jones's death while he was in custody of the ACCC. *See generally* Compl. Specifically, Plaintiff alleges that Mr. Jones sought medical treatment for chest pain but was not properly treated and was disregarded in the facility medical unit waiting area. until he was ultimately found unresponsive and unable to be resuscitated. *See id.*

18.     Based on these allegations of medical malpractice, wrongful death, and punitive damages, it is "apparent from the face" of the Complaint that the damages sought are greater than $75,000. *Robinson v. Am. Med. Response, Inc.*, No. 3:08-cv-153-WHB-LRA, 2008 WL 4793736, at *1 (S.D. Miss. 2008) (finding plaintiff clearly sought damages over $75,000 where plaintiff sought compensatory and punitive damages arising from wrongful death claim against ambulance company and its employee medical providers).

19.     The Complaint's punitive damages claim, alone, demonstrates Plaintiff seeks damages above the jurisdictional threshold. *See Compl.* ¶ 87. *See also Alexander v. DLJ Mortg. Capital, Inc.*, No. 3:15CV293-TSL-RHW, 2015 WL 3905250, at *2 (S.D. Miss. June 25, 2015) (collecting cases) ("It is well settled that, if Mississippi law permits punitive damages attendant to the particular claims the plaintiff is seeking redress for, then those damages are included in the computation of the amount in controversy.") *See also Allen v. R&H Oil & Gas Co.*, 63 F.3d 1326, 1336 (5th Cir. 1995) ("A court, in applying only common sense, would find that if the plaintiffs were successful in their punitive damages claim, they would collect more than [the amount in

controversy]. Accordingly, we hold that the face of the complaint supports the assertion of federal jurisprudence.").

20.     As such, the amount in controversy requirement of 28 U.S.C. § 1332 is satisfied in this case. *See Am. Heritage Life Ins. Co. r. Lang*, 321 F.3d 533, 537 (5th Cir. 2003); *Rodriguez v. Kivett's Inc.*, No. 3:05 CV 738 WHB JCS, 3:06 CV 13, 2006 WL 2645190, at *1 (S.D. Miss. 2006) ("The subject Complaint does not specify a dollar amount of damages sought by Plaintiff. [...] However, [...] as Plaintiff seeks compensatory and punitive damages arising from the alleged wrongful death of Barahona, the Court finds it is facially apparent that she is seeking damages in an amount greater than the jurisdictional limit."); *Benson v. City Finance Co.*, No. 1:02-cv-242-D-D, 2003 WL 715986, at *3 (N.D. Miss. Feb. 17, 2003) (inclusion of claims for punitive damages in the complaint "compels the conclusion" that damages exceed $75,000) (citing *De Aguilar v. Boeing Co.*, 11 F.3d 55, 57 (5th Cir. 1993) (holding that jurisdictional threshold was met where plaintiff sued for wrongful death.)).

21.     Based on the foregoing, Defendant has met its burden to establish that the amount in controversy requirement is satisfied.

### All Procedural Requirements for Removal are Satisfied.

22.     Plaintiff served Defendant on March 1, 2023.  This Notice of Removal is timely filed within thirty (30) days of receipt, through service or otherwise, of a copy of the initial pleading setting forth the claims for relief upon which this action is based in accordance with 28 U.S.C. § 1446(b).

23.     Copies of all process, pleadings and orders served upon Defendants to date in this action are attached as Exhibit "A", pursuant to 28 U.S.C. § 1446(a).

24.     Defendant has simultaneously provided notice of the removal of this action to Plaintiff and to the Circuit Court of Adams County, Mississippi, by filing a "Notice of Filing Removal Notice," together with a copy of this "Notice of Removal," in the Circuit Court of Adams County, Mississippi, and by serving copies of the same on Plaintiff's counsel pursuant to 28 U.S.C. §1446(d).

25.     There are no other defendants to this action who have been served with process and/or whose joinder is required in order to properly effectuate the removal of this action to this Court.

### Conclusion

26.     Nothing in this Joint Notice of Removal shall be interpreted as a waiver or relinquishment of the rights of Defendant to assert any defenses available to it, including but not limited to: (1) lack of jurisdiction; (2) improper venue; (3) insufficiency of process; (4) insufficiency of service of process; (5) improper joinder of claims and/or parties; (6) failure to state a claim; (7) the mandatory arbitrability of some or all of the putative claims; (8) failure to join an indispensable party(ies); (9) statute of limitations; or (10) any other pertinent defense available under Miss. R. Civ. P. 12 or Fed. R. Civ. P. 12, any state or federal statute or otherwise. Defendant specifically files this notice subject to, and incorporates herein, its Answer and Affirmative Defenses to the Complaint and affirmatively preserves each and every defense referenced above and/or generally available to it under applicable law and/or Court rules.

27.     Defendant requests a jury trial.

WHEREFORE, Defendant respectfully requests that the above-captioned action now pending in the Circuit Court of Adams County, Mississippi, be removed to the United States District Court for the Southern District of Mississippi, Western Division, and that the United States

District Court assume jurisdiction over this action and enter such other further orders as may be necessary to accomplish the requested removal and promote the ends of justice.

This the 22nd day of March, 2023.

Respectfully Submitted,
Defendant CoreCivic, Inc.

By: /s Anna Little Morris
LEM E. MONTGOMERY, III (MB No. 100686)
ANNA LITTLE MORRIS (MB No. 105299)
Attorneys for CoreCivic, Inc.

Of Counsel:
Butler Snow, LLP
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158
Tel: 601-948-5711
Fax: 601-985-4500
Lem.montgomery@butlersnow.com
Anna.morris@butlersnow.com

## CERTIFICATE OF SERVICE

I, Anna Little Morris, one of the attorneys for the Defendant, electronically filed the foregoing Notice of Removal with the Clerk of the Court using the Court's ECF system, which sent notification of such filing to the following counsel of record:

Robert B. McDuff
Miss. Bar No. 2532
757 North Congress Street
Jackson, MS 39202
601-259-8484
rbm@mcdufflaw.com
Counsel for Plaintiff

SO CERTIFIED, this the 22nd day of March, 2023.

s/ Anna Little Morris
ANNA LITTLE MORRIS

68164208.v1

8

 Wolters Kluwer

**CT Corporation**
**Service of Process Notification**
03/01/2023
CT Log Number 543320275

## Service of Process Transmittal Summary

TO:     Cole Carter, Associate General Counsel
        CORECIVIC
        5501 VIRGINIA WAY, SUITE 101
        BRENTWOOD, TN 37027

RE:     **Process Served in Mississippi**

FOR:    CoreCivic, Inc.  (Domestic State: MD)

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| TITLE OF ACTION: | Re: ESTATE OF HENRY MISSICK aka ANTHONY ALEXANDER. JONES by and through Personal Representative OWEN GOODWYNE // To: CoreCivic, Inc. |
| CASE #: | 23KV0014D |
| NATURE OF ACTION: | Medical Injury - Improper Care and Treatment |
| PROCESS SERVED ON: | C T Corporation System, Flowood, MS |
| DATE/METHOD OF SERVICE: | By Process Server on 03/01/2023 at 11:07 |
| JURISDICTION SERVED: | Mississippi |
| ACTION ITEMS: | CT will retain the current log |
| | Image SOP |
| | Email Notification,  Ann Parker  ann.parker@corecivic.com |
| REGISTERED AGENT CONTACT: | C T Corporation System |
| | 645 Lakeland East Drive |
| | Suite 101 |
| | Flowood, MS 39232 |
| | 866-665-5799 |
| | SouthTeam2@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

 **EXHIBIT A**

Page 1 of  1



Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:**                          Wed, Mar 1, 2023
**Server Name:**                   Drop Service

| | |
|---|---|
| Entity Served | CORECIVIC, INC. |
| Case Number | 23kv0014d |
| Jurisdiction | MS |

| Inserts | | |
|---|---|---|
| | | |



## IN THE CIRCUIT COURT OF ADAMS COUNTY, MISSISSIPPI

Estate of Henry Missick aka Anthony
Alexander Jones by and through
Personal Representative Owen
Goodwyne,
Plaintiff
v.                                              Civil Action No. 23-KV-0014-D
CoreCivic, Inc.,
Defendant.

## SUMMONS

THE STATE OF MISSISSIPPI
COUNTY OF ADAMS

TO: CoreCivic, Inc.
    c/o Registered Agent C T Corporation System
    645 Lakeland East Drive, #101 Flowood, MS 39232

### NOTICE TO DEFENDANT(S)

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND
YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

    You are required to mail or hand deliver a copy of a written response to the Complaint to
Robert B. McDuff_____ , the attorney for the Plaintiff(s), whose mailing address is ___767
N. Congress Street, Jackson, MS, 39202_ and whose street address is 767 N. Congress Street,
Jackson, MS, 39202.

    Your response must be mailed or delivered within (30) days from the date of delivery of
this summons and complaint or a judgment by default will be entered against you for the money
or other things demanded in the complaint.

    You must also file the original of your response with the Clerk of this Court within
a reasonable time afterward.

    Issued under my hand and the seal of said Court, this 14 day of February, 2023.

                                   Clerk of Adams County,
                                   Mississippi

RECEIVED
AND FILED

FEB 14 2023

IN THE CIRCUIT COURT OF ADAMS COUNTY, MISSISSIPPI

EVA J. GIVENS, CIRCUIT CLERK
BY_____D.C.

ESTATE OF HENRY MISSICK aka
ANTHONY ALEXANDER JONES by and
through Personal Representative
OWEN GOODWYNE

       Plaintiff,

v.

CORECIVIC, INC.

       Defendant.

No. 23-KY-0014-D

Jury Demanded

### COMPLAINT

1.      On December 17, 2020, Anthony Jones, born Henry Missick, died in Immigration and Customs Enforcement ("ICE") custody at Adams County Detention Center ("ACDC") in Natchez, Mississippi. He died alone waiting to receive medical attention that never arrived.

2.      Defendant CoreCivic is a private prison corporation that operates ACDC.

3.      On the morning of December 17, 2020, CoreCivic employees prevented Mr. Jones from seeking medical attention at ACDC's medical unit for at least thirty-six minutes after he first reported pain in his chest and burning in his arm.

4.      When Mr. Jones finally reached ACDC's medical unit, CoreCivic medical staff performed an electrocardiogram ("EKG") test on him. When the test yielded abnormal results, medical staff failed to properly monitor Mr. Jones or transport him to a hospital. Instead, the staff sent him to a medical waiting room.

1

5.     CoreCivic nurses checked his vital signs twice in that waiting room then left him alone. Four minutes later, he fell unconscious. Forty minutes then passed before he was found, and even longer before CoreCivic employees initiated cardiopulmonary resuscitation ("CPR") and other life saving measures. By then, it was too late and Mr. Jones died.

6.     The acts and omissions of CoreCivic and its employees were the cause of Mr. Jones' death.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this case pursuant to Miss. Const. art. VI, § 156. Venue lies in this Court pursuant to Miss. Code Ann. § 11-11-3. Adams County is where the acts, omissions, and events occurred that give rise to this Complaint. The Court has specific personal jurisdiction over Defendant given that CoreCivic operates ACDC in Adams County and operates another detention facility within the State of Mississippi.

## PARTIES

8.     The Estate of Henry Missick aka Anthony Alexander Jones was established by Florida's 17th Judicial Circuit Court on April 16, 2021. Mr. Jones was born Henry Missick but used the name Anthony Jones for most of his life. This suit is brought by the estate's personal representative, Owen Goodwyne.

9.     Defendant CoreCivic owns and operates ACDC and one other prison in Mississippi. At all relevant times, CoreCivic owned and operated ACDC under contract with Adams County, Mississippi. Adams County maintains an Intergovernmental Service Agreement with ICE to detain immigrants at ACDC.

2

## FACTS

### Anthony Jones' History

10.    Mr. Jones was born Henry Missick in the Bahamas on March 26, 1969, and came to the United States when he was fourteen-years-old.

11.    At some point after he entered the United States, Mr. Missick began using the name Anthony Jones.

12.    Mr. Jones worked in the United States, often building homes and tiling.

13.    Mr. Jones was not a U.S. citizen or permanent resident.  ICE arrested him on October 2, 2019 pursuant to a removal order and detained him at ACDC.

14.    He is now survived by his three daughters, aged thirty-three, twenty-seven, and four.

### CoreCivic's History

15.    Defendant CoreCivic has long failed to provide adequate medical care and to sufficiently staff its jails and prisons it operates.[1] These failures often carry deadly results.[2]

16.    In August of 2016, the U.S. Department of Justice's Office of the Inspector General ("DOJ OIG") detailed widespread deficiencies in staffing and medical care at prisons operated by private contractors, including CoreCivic (then Corrections Corporation of America).[3]

---

[1] *See e.g. Chaverra v. United States*, No. 4:19-CV-81 (CDL), 2020 WL 5579554, at *2 (M.D. Ga. Sept. 17, 2020) (Denying CoreCivic's motion to dismiss where facility "suffered from chronic shortages of medical staff positions; only one of the four required behavioral health positions in Stewart Detention Center's staffing plan was filled, there was no on-site psychiatrist, and there was only one licensed clinical social worker responsible for treating the nearly 2,000 detainees."); *Pierce v. D.C.*, 128 F. Supp. 3d 250, 284 (D.D.C. 2015) (finding prisoner's ADA and Section 504 rights violated at CoreCivic facility).
[2] *See e.g.* ICE Office of Professional Responsibility, Detainee Death Review – Raquel Calderon De-Hidalgo, https://www.ice.gov/doclib/foia/reports/ddr-Calderon.pdf; Office of Professional Responsibility, Detainee Death Review – Igor Zyazin, https://www.ice.gov/doclib/foia/reports/ddr-Zyazin.pdf.
[3] *See* DOJ OIG, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons-16-06*, Aug. 2016, available at https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18- 67-Jun18.pdf.

3

17.     That same year, CoreCivic shareholders filed suit alleging corporate misrepresentations regarding "inadequate health services and understaffing in its BOP facilities." *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2017 WL 6442145, at *15 (M.D. Tenn. Dec. 18, 2017).

18.     In 2020, the Tennessee Comptroller's Office found that CoreCivic failed to properly document inmate deaths and to adequately staff its facilities in the state.[4] In particular, the Comptroller found that "CoreCivic-managed facilities have experienced significant difficulties in hiring and retaining a sufficient number of correctional officers." and that "[l]ow staffing levels coupled with frequent overtime impacts management's ability to provide safe and secure facilities, especially in emergencies."

19.     A chart compiled as part of the audit revealed CoreCivic facilities in Tennessee logged more than double the number of "life-threatening matters and breaches of security" compared to non CoreCivic facilities.[5]

20.     Despite multiple warnings regarding the violations of basic standards of medical medical care and staffing, CoreCivic facilities continue to be plagued by the same problems.[6]

### ACDC's History

21.     Defendant Corecivic opened ACDC in July of 2009. At the time, CoreCivic, which was then known as the Corrections Corporation of America, contracted with the United States Bureau of Prisons to use ACDC as a federal prison.

---

[4] *See* Tennessee Comptroller of the Treasury, *Performance Audit Report-Department of Correction*, Jan. 2020, available at https://comptroller.tn.gov/content/dam/cot/sa/advanced-search/2020/pa19032.pdf.
[5] *Id.* at 62.
[6] DHS OIG, *OIG-21-61: Violations of ICE Detention Standards at Torrance County Detention Facility,* Sep. 28, 2022, available at
https://www.oig.dhs.gov/sites/default/files/assets/2022-09/OIG-22-75-Sep22.pdf;  DHS OIG, *OIG-21-61: Violations of ICE Detention Standards at Otay Mesa Detention Center,* Sep. 21, 2021, available at https://www.oig.dhs.gov/sites/default/files/assets/2021-09/OIG-21-61-Sep21.pdf.

4

22.     In 2012, a riot at ACDC left one correctional officer dead and twenty other people injured. A DOJ investigation determined that the "cause of the riot was what the inmates perceived to be inadequate food, medical conditions and disrespectful staff members."[7] Those imprisoned at ACDC at the time described how facility staff continuously ignored conditions that were "increasingly dangerous and intolerable, including medical neglect, excessive use of segregation, spoiled food, a lack of interpreters, and mistreatment by staff."[8]

23.     In May of 2019, the DOJ opted against renewing its contract with ACDC.[9] Four months later, CoreCivic announced that it contracted with ICE to detain immigrants at ACDC. At the time ICE Field Office staff recommended against entering into the contract "because of that facility's history of chronic understaffing in correctional and health services."[10]

24.     Since 2019, allegations of poor medical treatment and other abuses at ACDC have persisted.[11]

---

[7] DOJ, *Two Inmates Sentenced in Adams County Prison Riot Case*, Jul. 13, 2016, available at https://www.justice.gov/usao-sdms/pr/two-inmates-sentenced-adams-county-prison-riot-case.

[8] Janosch Delcker, *FATAL CORRECTIONS Inside the Deadly Mississippi Riot That Pushed the Justice Department to Rein In Private Prisons*, The Intercept, Dec. 17, 2016, available at https://theintercept.com/2016/12/17/inside-the-deadly-mississippi-riot-that-pushed-the-justice-department -to-rein-in-private-prisons/.

[9] The Natchez Democrat, *CoreCivic: Federal Bureau of Prisons will not renew contract with Adams County Correctional Center*, May 2, 2019, https://www.natchezdemocrat.com/2019/05/02/core-civic-federal-bureau-of-prison-will-not-renew-contra ct-with-adams-county-correctional-center/.

[10] Corecivic, *CoreCivic Enters Into New Management Contract at the Adams County Correctional Center*, Sep. 3, 2019, https://ir.corecivic.com/news-releases/news-release-details/corecivic-enters-new-management-contract-ad ams-county; U.S. Gov't and Accountability Office, *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* at 22, Jan. 13, 2021, https://www.gao.gov/products/GAO-21-149.

[11] *See e.g. Letter Secretary Mayorkas and Acting Director Johnson*, Member of Congress Jason Crow *et. al*, May 11, 2021, https://crow.house.gov/sites/crow.house.gov/files/05.11.21%20-%20Letter%20to%20Secretary%20Mayor kas%20and%20Acting%20Director%20Johnson%20Regarding%20GAO%20Report%20on%20ICE%20 Detention%20Contracts.pdf; *ICE use of torture to coerce immigrants into signing immigration documents at Adams County Correctional Facility*, Freedom for Immigrants, Oct. 8, 2020, https://www.freedomforimmigrants.org/crcl/2020/10/8/re-immigration-and-customs-enforcement-officers -use-of-torture-to-coerce-immigrants-into-signing-immigration-documents-at-adams-county-correctional- facility; Gaby del Valle and Jack Herrera, *'Like Petri Dishes for the Virus': ICE Detention Centers*

### Mr. Jones' Death at ACDC

25.     On October 15, 2019, ACDC Nurse Practitioner ("NP")[12] Stacy Cook performed an initial screening of Mr. Jones. The screening revealed that Mr. Jones suffered from high blood pressure.

26.     On October 28, 2019, NP Cook took an EKG of his heart.

27.     On November 12, 2019, Dr. Collins reviewed the EKG results, which displayed a sinus rhythm with possible left ventricular hypertrophy.

28.     Dr. Collins chose to place Mr. Jones on weekly blood pressure monitoring. She did not refer Mr. Jones to a cardiologist or take any other signification action. CoreCivic medical staff failed to perform their weekly checks on Mr. Jones on one or more occasions in November of 2019 and January and May of 2020.

29.     Mr. Jones began experiencing frequent nosebleeds and sinus pain during his time in detention.

30.     On December 17, 2020, the date of his death, Mr. Jones first complained of chest pains to another detained person in his unit at around 3:45 a.m. His first opportunity to report his symptoms occurred at 7:00 a.m. when guards Winey and Williams came to his cell to count him for ACDC's scheduled facility-wide count of detained persons.

31.     He told the guards that he was experiencing chest pains and that his arm was hurting. They told him that he needed to wait until the facility count finished before he could go to the medical unit.

---

*Threaten the Rural South*, Politico, May 5, 2020,
https://www.politico.com/news/magazine/2020/05/05/coronavirus-ice-detention-rural-communities-18668 8.
[12] CoreCivic employed all ACDC medical staff and guards referenced in this complaint during all times relevant to the complaint.

32.     At 7:24 a.m., Mr. Jones approached the guard station in his unit and again reported his chest pain. However, he again was told, by guard Murphy and Lieutenant Lowe, that he needed to wait until the count finished.

33.     When guard Murphy then asked guard Barnes in ACDC's central control unit for instructions, Ms. Barnes responded that Mr. Jones would have to wait until the count finished. CoreCivic policy and practice does not allow movement of a detained person during a facility count.

34.     As Mr. Jones waited, he sank his head between his legs and continuously grabbed and rubbed his arm and legs. Despite these obvious signs of distress, the guards did not allow Mr. Jones to leave the unit until 7:36 a.m., when the count had finished and guard Detrick Windling escorted Mr. Jones to the medical unit.

35.     Mr. Jones arrived at the ACDC medical unit at 7:39 a.m. There, he reported to RN Brown, the charge nurse on duty, and ACDC Lieutenant Moore that he had felt burning in his chest and arms for the past three hours.

36.     At 7:54 a.m., RN Brown completed an EKG of Mr. Jones, which showed various abnormalities such as mild sinus bradycardia (52 bpm), moderate ST depression in V3, V4" and T wave inversions. ACDC's medical computer system alerted Dr. Collins of these abnormalities. At that point, Dr. Collins and Nurse Brown should have immediately called 911 and transported Mr. Jones to a hospital, the closest of which was only a twenty minute drive away.

37.     Rather than call for Mr. Jones to be transported to the hospital, Dr. Collins at 8:01 a.m. ordered that Mr. Jones be placed on 2 liters of oxygen, administration of aspirin, nitroglycerin sublingual tablets, and Mylanta and further ordered that CoreCivic medical staff monitor Mr. Jones for one hour. Dr. Collins did not order that Mr. Jones be kept on an EKG or

7

other heart monitor.  She also decided that Mr. Jones should be taken out of the medical unit and placed into a peripheral medical waiting room.

38.     At 8:06 a.m., ACDC Licensed Nurse Practitioner ("LPN") Kenishia Coffie escorted Mr. Jones out of the medical unit, where he would have been easily observable by medical staff, to the waiting room.

39.     While medical staff are required by CoreCivic policy to remain within "sight and sound" of all patients, there is no such requirement for the medical waiting room. Nonetheless, the medical waiting room is observable both through ACDC's closed circuit television and through a large window between the medical unit and the waiting room. However, while Mr. Jones was in the waiting room, neither the medical staff nor any guards monitored him on an ongoing basis through direct observation or closed circuit television. Between 8:18 a.m. and 8:26 a.m., LPN Coffie and RN Tenner each took Mr. Jones' vital signs once. Mr. Jones reported to LPN Coffie that he still felt burning in his right arm. The nurses exited the waiting room immediately after taking Mr. Jones' vital signs to attend to other duties.

40.     Four nurses, along with a CoreCivic officer who briefly entered the waiting room, observed Mr. Jones touching his arms, rubbing his legs, and rocking back and forth uncomfortably. However, none reported the symptoms to Dr. Collins or called 911.

41.     After 8:26 a.m., all CoreCivic staff left Mr. Jones alone in the waiting room and no CoreCivic employee maintained any visual observation of him. Mr. Jones continued touching his arms, rubbing his legs, and rocking back and forth.

42.     At 8:30 a.m., Mr. Jones began moving his arms and then slumped over to his right. His legs then began moving and his body started jerking. Mr. Jones then urinated on himself and fell motionless across the chairs in the waiting room.

8

43.     Mr. Jones laid there alone, motionless, and covered in his own urine for the next **forty minutes.** A CoreCivic guard discovered him at 9:10 a.m.

44.     The guard tapped him on the shoulder, and when Mr. Jones did not respond, she exited the waiting room.

45.     It was four minutes later, at 9:14 a.m., before Dr. Collins and RN Brown entered the waiting room and checked Mr. Jones for a pulse. They failed to immediately perform CPR or other life saving measures on Mr. Jones.

46.     Not until 9:22 a.m. did CoreCivic medical staff begin CPR on Mr. Jones. They did not apply automated external defibrillation ("AED") until 9:24 a.m. or administer ephedrine until 9:27 a.m.

47.     CoreCivic medical staff's efforts to revive Mr. Jones continued until 9:56 a.m., when a paramedic arrived. The paramedic pronounced Mr. Jones dead three minutes later of heart failure.

48.     A state medical examiner performed an autopsy on Mr. Jones' body on December 21, 2020 and listed the cause of death as Artherosclorotic Cardiovascular Disease.

49.     Had treatment been administered earlier that morning, Mr. Jones' life could have been saved.  He should have been sent to the medical unit sooner.  An ambulance should have been called immediately after the problematic EKG reading so Mr. Jones could be transported to the hospital.  He he been in an ambulance or the hospital instead of ACDC when he lost consciousness, medical staff would have been able to immediately begin administering life saving measures such as CPR, AED, and ephedrine.

9

50.     Initiating CPR, AED, and ephedrine quickly is the standard medical intervention when an individual has a heart attack or other serious cardiac complications and dramatically increases chances of survival.

51.     Had Mr. Jones been in a hospital, a proper cardiology evaluation would have discovered the blockages in his arteries. In addition to administering emergency measures when he passed out, hospital staff could and would have taken other measures to clear the blockages and save his life.

52.     Even though an ambulance was not called immediately after the EKG reading, CoreCivic's medical staff could have prevented his death if they had provided the constant monitoring that his condition required and administered emergency measures immediately after he passed out. Those emergency measures would have allowed him to continue to live while they called an ambulance and had him transported to the hospital, where he could receive the necessary treatment.

53.     Because Mr. Jones was not in a hospital or an ambulance or in the medical unit at ACDC when he lost consciousness that morning, and because he instead was unmonitored by CoreCivic staff in the medical waiting room, nearly an hour passed before life-saving treatment was administered. By then it was too late.

### Standards and Directives

54.     At all times relevant to this complaint, CoreCivic was required to follow ICE's 2011 Performance Based National Detention Standards ("PBNDS"), ICE's ACDC Quality Assurance Surveillance Plan ("QASP"), the American Correctional Association's Performance Based Standards for Adult Local Detention Facilities ("ACA Standards"), and the National Commission on Correctional Health Care's Standards for Health Services in Jails ("NCCHC

Standards") at ACDC pursuant to an intergovernmental service agreement and other contracts between ICE, Adams County, and CoreCivic.

55.    The 2011 PBNDS mandates that each facility's administrator "shall ensure that the facility conducts appropriate orientation, initial training and annual training for all staff, contractors and volunteers" and implement "appropriate assessment measures."[13]

56.    Under the PBNDS' health care section, each facility contractor is responsible for providing detained persons "specialty health care," "emergency care," and "hospitalization as needed within the local community."[14]

57.    Under the ACA Standards, detained persons who require health care beyond the resources available in a facility must be referred and transferred to a facility where such care is available. Treatment of a detained person's condition should not be limited by the resources and services available within a given facility.

58.    Likewise, per the NCCHC standards, a facility operator must provide appropriate and timely access to specialty care and hospital services to patients who need these services. Clinical need must dictate when the patient receives those services.

59.    In areas "where detainees are admitted for health observation and care under the supervision and direction of health care personnel," the 2011 PBNDS requires that staff members remain "within sight or sound of all patients."[15]

60.    Similarly, under the ACA Standards, detention facilities that maintain an onsite medical unit must ensure that patients are within sight or sound of a staff member.

---

[13] *See* ICE, 2011 PBNDS 7.3: Staff Training, revised Dec. 2016, available at: https://www.ice.gov/doclib/detention-standards/2011/7-3.pdf.
[14] *See* ICE, 2011 PBNDS 4.3: Medical Care, revised Dec. 2016, available at: https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf.
[15] *Id.*

61.    Per the NCCHC Standards, space in a facility's medical unit "may also be used to provide observation beds" in which detained people may be watched and supervised by staff.

62.    The 2011 PBNDS requires that a facility's health services administrator ensure "that medical staff have training and competency in implementing the facility's emergency health care plan appropriate for each staff's scope of practice or position." A facility's administrator must ensure "that non-medical staff have appropriate training and competency in implementing the facility's emergency plan appropriate for each staff's position."[16]

63.    Under the QASP, "all new Officers and Custody staff will receive 120 hours of training as delineated in the ACA Standards during the first year of employment." The contractor must then "conduct 40 hours of Refresher Training for all Officers and Custody staff" yearly.

64.    Pursuant to the QASP, security staff "shall be trained annually in basic first aid and CPR" and must be able to respond to emergency situations within four minutes, recognize warning signs of impending medical emergencies, and know how to obtain medical assistance.

65.    Contractors must also "provide medical staff and sufficient support personnel to meet these [medical] standards." Staffing plans must be "reviewed at least annually."

66.    Specifically as to emergency care, the PBNDS requires that staff be trained on "cardio pulmonary resuscitation (CPR, AED), and emergency first aid training annually," on how to respond to "health-related situations within four minutes," and on the appropriate "plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services."[17]

67.    When a facility's "non-medical employee is unsure whether emergency care is required, he/she shall immediately notify medical personnel to make the determination."[18]

---

[16] *Id.*
[17] *Id.*
[18] *Id.*

68. The 2011 PBNDS requires that contractors allow detained persons access to emergency medical care during a population count. If, "while conducting a count, staff observe an unusual incident (e.g., medical emergency, criminal act), they shall cease the count and respond appropriately according to local procedures."[19]

69. Mississippi healthcare regulations also governed medical care at ACDC.

70. The Minimum Standards of Operation for Mississippi Hospitals Facilities ("Minimum Standards"), defines a hospital as "a place devoted primarily to the maintenance and operation of facilities for the diagnosis, treatment and care of individuals suffering from physical or mental infirmity, illness, disease, injury or deformity, or a place devoted primarily to providing obstetrical or other medical, surgical, or nursing care of individuals." 15 Miss. Code R. § 16-1-41.2.1 ACDC's medical unit is a hospital.

71. Under the Minimum Standards, "[facilities] shall be provided to assure prompt diagnosis and emergency treatment." 15 Miss. Code R. § 16-1-41.27.1.

72. Facilities must have "adequate medical and nursing personnel available at all times," and "medical staff shall be responsible for insuring adequate medical coverage for emergency services." 15 Miss. Code R. § 16-1-41.28.1-2.

73. The facility must "maintain an organized nursing staff to provide high quality nursing care for the needs of the patients and to be responsible to the hospital for the professional performance of its members." 15 Miss. Code R. § 16-1-41.30.1. It must also ensure "sufficient number of duly licensed registered nurses on duty at all times to plan, assign, supervise, and evaluate nursing care, as well as to give patients the nursing care that requires judgment and specialized skills of a registered nurse." *Id.*

---

[19] *See* ICE, 2011 PBNDS 2.8: *Population Counts, revised* Dec. 2016, available at
https://www.ice.gov/doclib/detention-standards/2011/2-8.pdf.

74.     Policy 3.12 of the Mississippi State Board of Medical Licensure allows "a physician to work in consultation with or employ allied health professionals, as long as they are appropriately trained to perform the activities being requested."[20] However, the "physician is the one ultimately responsible for all care given" and must "never delegate a task beyond the education and training of the medical assistant." A physician also should provide "[d]irect and proper supervision. . . at all times."

75.     Pursuant to the Mississippi Board Of Nursing Rules And Regulations, a RN "shall be held accountable for the quality of nursing care given to patients." 15 Miss. Code R. § 30-2830-1.2. This responsibility includes "[m]aking decisions that are based upon knowledge, competency, experience and the use of the nursing process." and "[p]racticing within the scope of practice as established by the board and according to generally accepted standards of practice." 15 Miss. Code R. 30-2830-1.1.

76.     RNs are also responsible and accountable for "[o]rganizing, administering and supervising the implementation and evaluation of a written nursing care plan for each patient for whom responsibility has been accepted" and "communicating patient response to nursing interventions to other members of the health team." 15 Miss. Code R. § 30-2830-1.2(G), 1.4.

77.     A LPN's responsibilities include "[p]roviding for the emotional and physical comfort of patients. . . [o]bserving, recording and reporting to the appropriate person the signs and symptoms which may be indicative of change in the patient's condition" and appraising a "patient's status and situation at hand that contributes to ongoing data collection and the comprehensive assessment by the RN." 15 Miss. Code R. § 30-2830-2.3(B)-(D).

---

[20] Mississippi State Board of Medical Licensure, Policies, Sep. 2021, available at:
https://www.msbml.ms.gov/sites/default/files/Rules_Laws_Policies/9-2021Policies.pdf

**DHS OIG Report**

78.      On July 14, 2021, the Department of Homeland Security's Office of Inspector General ("DHS OIG") released a report regarding detention conditions at ACDC.[21]

79.      The report concluded that after CoreCivic medical staff administered its December 17, 2020 EKG on Mr. Jones, they should have promptly called 911 and sent Mr. Jones to the hospital where life support care would have been readily available.

## NOTICE

80.      A notice of intent to sue consistent with Miss. Code Ann. 15-1-36(15) was served on the Defendant on December 16, 2022.

## CLAIM FOR RELIEF

81.      Plaintiff realleges and incorporates by reference all allegations in the foregoing paragraphs.

82.      The Defendant is liable for the actions and omissions of all of its agents and employees, including those who are referenced in this Complaint.

83.      At all relevant times, the Defendant and its employees had a duty to exercise ordinary and reasonable care for Mr. Jones. The medical staff had a duty to provide competent treatment with acceptable levels of care, skill, and diligence, and to provide quality medical care and treatment consistent with national and state standards.

84.      The actions and omissions of the Defendant and its employees with respect to Mr. Jones were a breach of these duties and fell below these standards. These actions and omissions were negligent, grossly negligent, reckless, willful, intentional, and malicious. They also constitute negligence per se. They were the proximate cause of Mr. Jones' suffering and death.

---

[21] DHS OIG, *Violations of ICE Detention Standards at Adams County Correctional Center*, Jul. 14, 2021, https://www.oig.dhs.gov/sites/default/files/assets/2021-07/OIG-21-46-Jul21.pdf.

15

Had the Defendant and its employees fulfilled their duties and performed according to the required standard of care, Mr. Jones would not have died.

85.     These acts and omissions include, but were not limited to, the failure by the guards and others to deliver Mr. Jones to the medical unit sooner, the failure of the medical staff to refer Mr. Jones for treatment by a specialist, the failure of the medical staff to call 911 on December 17, 2020 and send Mr. Jones to the hospital so that he could be treated promptly, the failure of medical staff and guards to consistently monitor the condition of Mr. Jones on December 17, 2020 so that emergency treatment could be promptly administered when needed, the failure to promptly administer emergency treatment, and any understaffing that contributed to these acts and omissions.

## DAMAGES

86.     As a direct and proximate cause of the Defendant's actions and omissions, Mr. Jones died on December 17, 2020.  He and his survivors endured and incurred damages, including but not limited to severe and foreseeable physical and emotional pain and suffering, loss of enjoyment of life, funeral expenses, and all other damages available for his wrongful death.  Consistent with Miss. Code Ann. 11-1-59, the amount of damages is not specified but it exceeds $10,000.00 and is within the jurisdictional limits of this Court.

87.     The acts and omissions of the Defendant were intentional, wanton, malicious and/or exhibited a deliberate,conscious, and/or reckless disregard for Mr. Jones' safety, his rights, and his life, and should be punished with an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court empanel a jury and upon the conclusion of the trial:

16

a.   Enter judgment in favor of Plaintiff and against the Defendant;

b.   Award Plaintiff compensatory damages against all Defendants and punitive damages
     against Defendant in amounts to be determined by the jury at trial;

c.   Award Plaintiff reasonable attorneys' fees and costs; and

d.   Award Plaintiff such further relief as the Court deems just, equitable, and appropriate

Dated: February 14, 2023

Respectfully submitted,

Robert B. McDuff
Miss. Bar No. 2532
767 North Congress Street
Jackson MS 39202
601-259-8484
rbm@mcdufflaw.com

*Counsel for Plaintiff*

17

## CERTIFICATION

I hereby certify that I have reviewed the facts of this case and obtained a consultation with a medical expert qualified to provide expert testimony as to the standard of care and negligence and who I reasonably believe is knowledgeable in the issue relevant to this particular case, and on the basis of such review and consultation believe that there is a reasonable basis for the commencement of this action.

This 13th day of February, 2023.

Robert B. McDuff

18